# IN THE SUPREME COURT OF CALIFORNIA

FOX PAINE & COMPANY, LLC, et al.,
Plaintiffs and Appellants,

v.

TWIN CITY FIRE INSURANCE COMPANY et al.,
Defendants and Respondents.

S287404

First Appellate District, Division Two
A168803

San Francisco City and County Superior Court
CGC17557275

July 27, 2026

Chief Justice Guerrero authored the opinion of the Court, in which Justices Liu, Kruger, Groban, Evans, DeSantos,* and Feinberg** concurred.

---

\* Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

\*\* Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

FOX PAINE & COMPANY, LLC v. TWIN CITY FIRE
INSURANCE COMPANY

S287404


Opinion of the Court by Guerrero, C. J.


Insurance is sometimes procured in a series of layers, with an insured acquiring a primary insurance policy that provides an initial layer of coverage for loss or liability and an excess insurance policy or policies that provide additional coverage in the event the underlying coverage is exhausted. (See *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215, 222–223.) Excess insurance policies vary in how they define exhaustion. Some excess policies provide that underlying insurance policies are exhausted and coverage under the excess policy attaches only when the coverage limits on the underlying policies have been fully paid out.

In this case, we consider whether claims for declaratory relief and breach of the implied covenant of good faith and fair dealing brought by alleged insureds (hereinafter referred to as insureds) against excess insurers are susceptible to demurrer on the ground that the insureds could not allege prior exhaustion of all of the insurance coverage underlying the excess insurers' policies. We conclude that the absence of exhaustion is not fatal to these claims.

The issue arises here after a dispute between former colleagues at an investment firm led to lengthy — and expensive — litigation. Plaintiffs, representing one faction within this feud, later brought this lawsuit asserting several

1

causes of action against three insurers that had issued excess insurance policies to the firm. The operative complaint alleges that the excess insurers breached the policies by not indemnifying plaintiffs for expenses they incurred in the earlier litigation. Plaintiffs also assert that the failure to pay them policy benefits and other conduct by the excess insurers that allegedly favored the other faction over theirs violated the covenant of good faith and fair dealing that is implicit within the excess policies. In addition to seeking damages, plaintiffs request a series of judicial declarations, including declarations that their insurance claims are covered by the excess policies and must be paid by the excess insurers.

When the excess insurers demurred to the complaint, the trial court determined that plaintiffs had alleged exhaustion of the primary insurance policy through compensation that the primary insurer had provided to the other faction, but that none of the excess insurance policies had been exhausted. On this basis, plaintiffs' claims relating to the first layer of excess insurance were allowed to proceed, but the trial court sustained the demurrers filed by two other excess insurers who supplied higher layers of excess coverage. The Court of Appeal affirmed the resulting judgment of dismissal.

Plaintiffs now challenge the rejection of their claims against the two excess insurers for declaratory relief and breach of the implied covenant of good faith and fair dealing. They argue that the lower courts placed too much emphasis on the lack of actual exhaustion.

We conclude that an insured may state a viable cause of action for declaratory relief regarding coverage and liability under an excess insurance policy even if all of the underlying

2

insurance coverage has not yet been exhausted. While insureds in this position must adequately plead their covered losses, the relevant principles governing the availability of declaratory relief do not support a strict rule that would withhold this relief whenever exhaustion has not also been alleged. We also hold that an insured suing an excess insurer for tortious breach of the implied covenant of good faith and fair dealing does not have to allege the prior exhaustion of all underlying insurance. It is sufficient to allege facts that, taken as true, show that coverage under an excess policy *will* attach, and that the insurer's misconduct has impaired the insured's recovery of benefits owed to it under the policy.

In light of these holdings, we reverse the judgment of the Court of Appeal and remand the cause to that court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The background facts provided below are drawn from the allegations in the third amended complaint filed by plaintiffs Saul Fox (Fox), Fox Paine & Company, LLC (FPC), and related entities.[1] We treat the factual allegations in the complaint as true for present purposes.

To summarize what follows, plaintiffs allege that three excess insurers improperly allowed plaintiffs' former colleagues at an investment firm, who later became their rivals in lengthy litigation proceedings, to usurp an insurance claim seeking recovery for expenses incurred in that litigation. Plaintiffs

---

[1]     In addition to Fox and FPC, the plaintiffs in this case are Fox Paine Capital Fund II International, L.P.; FP International LPH, L.P.; and Fox Paine International GP, Ltd.

contend that the claim should have been understood as having been submitted on their behalf and resulted in substantial insurance payouts to them, but that as yet, they have received nothing under any of the excess policies.

This lawsuit derives from earlier litigation between Fox and Dexter Paine (Paine), the cofounders of FPC, an investment firm. Fox and Paine managed two investment funds together. In 2006, Paine wanted to establish a third fund, while Fox preferred not to. Paine proceeded to launch the fund on his own as a new company, Fox Paine Management III, LLC (FPM III). Fox did not participate in the management of the fund but had a small investment stake in it. An agreement was reached whereby "[a]ny material commitment, action, or undertaking by FPC" would require approvals from both Fox and Paine, and FPC employees could provide services to FPM III while remaining employees of FPC.

The relationship between Fox and Paine deteriorated soon thereafter. In August 2007, FPC, Fox, and related parties (the Fox Parties)[2] sued Paine, FPM III, FPC,[3] and Paine's family trust (the Paine Parties) in Delaware after Paine and others poached employees from FPC to go work for FPM III, arranged lucrative compensation packages for defecting employees, and fraudulently represented that Fox had authorized various actions when he had not done so. The Paine Parties soon filed counterclaims (which the complaint refers to as the Paine

---

[2] The complaint describes these related parties as "two Fox-owned entities."

[3] The complaint alleges that FPC was sued only "nominally."

Counterclaims) against the Fox Parties. The Delaware litigation, including the Paine Counterclaims, was quickly resolved through settlement, only to be followed by new litigation. This follow-on litigation, which the complaint refers to as the "Continuing Paine Claims," continued for several years.

The extensive litigation between the Fox Parties and the Paine Parties led to the presentation of claims under insurance policies that provided coverage to FPC, related entities, and affiliated individuals. The policies consist of a primary insurance policy issued by Houston Casualty Company (HCC) and four excess policies issued by three other insurers. The complaint identifies specific provisions in the primary policy that, according to plaintiffs, provide coverage for investigation and defense costs incurred in litigation such as the Delaware litigation and the Continuing Paine Claims. Each excess policy is a "follow form" policy that adopts the substantive coverage terms appearing within the HCC policy.

All told, $10 million in primary coverage was provided by HCC; defendant Twin City Fire Insurance Company (Twin City) provided a first excess layer of $10 million in coverage; defendant St. Paul Mercury Insurance Company (St. Paul) provided a second excess layer of $10 million in coverage; Twin City provided a third excess layer of $10 million in coverage; and defendant Liberty Mutual Insurance Company (Liberty Mutual) provided a fourth excess layer of $10 million in coverage. Combined, these policies created a $50 million coverage tower with HCC's primary policy at the base and Liberty Mutual's excess policy at the top. Each excess insurance policy conditions the issuing insurer's liability on exhaustion of all underlying

insurance, whether through full payment of all underlying insurance up to the policy limits (as provided in the Twin City and St. Paul policies) or through such payment or all underlying insurers "being held liable to pay in legal currency the full amount of the Underlying Limit of Liability as loss" (as specified in the policy issued by Liberty Mutual).[4]

According to the complaint, in November 2007 FPC's insurance broker, acting on behalf of FPC and all other insureds under the policies, sent the excess insurers notice of the Delaware litigation. The complaint alleges that although this notice did not mention the Paine Counterclaims, the excess insurers had actual knowledge of, or through the exercise of reasonable diligence should have become aware of, these counterclaims. The complaint further alleges that the excess

---

[4] The exhaustion provision in Twin City's policies provides that "[i]t is expressly agreed that liability for any loss shall attach to the Underwriters only after the Primary and Underlying Excess Insurers shall have paid the full amount of their respective liability . . . or the Insured(s) shall have paid the full amount of such liability due to the financial insolvency of an insurer of the Underlying Insurance. The Underwriters shall then be liable to pay only such additional amounts up to the Limit of Liability set forth in [the policy]." St. Paul's policy specifies that "[t]he Insurer shall only be liable to make payment under this policy after the total amount of all Underlying Limits of Liability has been paid in legal currency by the issuers of all Underlying Insurance as covered loss thereunder." Liberty Mutual's policy contains language providing, "Except as provided in paragraph 4.1 [addressing the insolvency of an insurer], this Policy only provides coverage when the Underlying Limit of Liability is exhausted by reason of the insurers of the Underlying Policies paying or being held liable to pay in legal currency the full amount of the Underlying Limit of Liability as loss."

insurers failed to provide the Fox Parties, including FPC, with a coverage analysis relating to those claims, that they did not properly communicate with the Fox Parties about these claims, and that they closed their files once the Delaware litigation concluded.

Later, after the initiation of the Continuing Paine Claims, an FPM III partner wrote to HCC inquiring about the status of the 2007 notice. He represented that the notice had been submitted on behalf of the Paine Parties and that only the Paine Parties were pursuing a claim under the HCC policy. The excess insurers knew about this correspondence but did not inform plaintiffs about it. Without notifying plaintiffs, HCC paid the Paine Parties the entire $10 million available under its policy.

The Paine Parties also presented claims for coverage to Twin City and St. Paul. These insurers denied the claims in 2012. At a meeting with all three excess insurers in September 2012, the Paine Parties continued to demand coverage. The next year, Twin City and St. Paul filed declaratory relief actions against the Paine Parties, FPC, FPC's executives, and others, seeking declarations that there was no coverage under the policies. Liberty Mutual knew about these lawsuits before they were filed but did not inform plaintiffs about them. Although both Twin City's and St. Paul's complaints named FPC as a defendant, neither insurer served its complaint on FPC. Instead, FPC only learned about the actions through a third-party docket alert. This was the first time that plaintiffs learned about HCC's earlier payment to the Paine Parties, and that Twin City and St. Paul had been communicating with the Paine Parties pursuant to the earlier notice.

Twin City and St. Paul soon settled with the Paine Parties for a total of $9 million. Approximately $6 million of this amount was allocated to the first-excess-layer Twin City policy and approximately $3 million was assigned to the St. Paul policy, with both insurers claiming that the settlement proceeds were indemnity payments under the excess policies.

Plaintiffs had requested information from Twin City and St. Paul about the Paine Parties' insurance claims. After the settlement, Twin City and St. Paul each wrote back to plaintiffs, refusing to provide information about the claims and falsely maintaining that they had not paid any proceeds to the Paine Parties. Liberty Mutual also knew about the settlement but did not tell plaintiffs about it.

Plaintiffs allege that they "have submitted to the . . . Excess Insurers virtually all of their invoices — seeking approval and reimbursement thereof — detailing the Loss arising out of the Delaware Litigation and the Continuing Paine Claims." Yet "the . . . Excess Insurers have failed to communicate with Plaintiffs concerning their receipt of those invoices, have failed to conduct a good-faith, reasonable and timely investigation of Plaintiffs' coverage claims, and have failed to reimburse Plaintiffs[] for their Losses." Plaintiffs assert that "[i]n defending themselves from and against the Delaware Litigation and Continuing Paine Claims," they "have incurred covered 'Loss' and recoverable interest exceeding $43,000,000, not subject to offset, according to proof at the time of trial."

The operative third amended complaint alleges four causes of action, for breach of contract, declaratory relief, breach of the implied covenant of good faith and fair dealing (also

known as a "bad faith" claim), and aiding and abetting breaches of fiduciary duties.

Concerning declaratory relief, plaintiffs allege that "[a]n actual justiciable controversy exists" regarding "the proper interpretation of the FPC [E]xcess Policies and Defendants' obligations thereunder to insure and reimburse Plaintiffs for 'Loss' incurred in connection with the Delaware Litigation and the Continuing Paine Litigation" and as to whether "the HCC Policy is exhausted by payment of 'Loss' thereunder." With each excess insurer, plaintiffs allege that there are actual controversies regarding whether: (1) the insurer's policy is "triggered by the exhaustion of" all underlying insurance; (2) "Plaintiffs' losses constitute covered 'Loss' under the policy"; and (3) the insurer "should be held liable to pay, and must actually pay" policy benefits to plaintiffs.

Regarding breach of the implied covenant of good faith and fair dealing, plaintiffs allege that all of the excess insurers "were or should have been aware" that "[p]laintiffs had the only valid and legitimate claim to insurance under the" excess policies and that "Twin City['s] and St. Paul's [2013] disbursement of proceeds to the Paine Parties, who were not legitimate insureds [because they were suing FPC and being sued for actions adverse to FPC], could not and did not reduce the limits available to Plaintiffs under the" excess policies. Plaintiffs also allege that the excess insurers failed "to provide reasonably prompt notice to any legitimate representative of FPC" regarding the November 2007 notice, subsequent coverage determinations, plaintiffs' rights and benefits under the excess insurance policies, coverage decisions regarding the Paine Parties, and the declaratory judgment actions. According to

plaintiffs, due to the excess insurers' failure to properly communicate with them they did not learn about Twin City's and St. Paul's settlement with the Paine Parties until September 2016, more than three years after the agreement was reached. Plaintiffs allege that the excess insurers' alleged misconduct "prevented Plaintiffs from receiving the proceeds and benefits of" the excess insurance policies.

Twin City, St. Paul, and Liberty Mutual all demurred to the third amended complaint.[5] The three excess insurers argued in their demurrers that plaintiffs' claims concerning the higher-layer excess policies (i.e., the policies above Twin City's first-excess-layer policy) failed due to a lack of exhaustion of all underlying insurance. The trial court concluded that plaintiffs had sufficiently alleged exhaustion of the primary HCC policy and on that basis it allowed plaintiffs' claims against Twin City to proceed to the extent they involved Twin City's first-excess-layer policy. But the trial court also reasoned that "[a]s Twin City only paid $6 million out of its first excess policy, which has a limit of $10 million, . . . exhaustion has not yet occurred for St. Paul, Twin City (as to the third coverage policy), and Liberty to be held liable." The trial court sustained the demurrers filed by St. Paul and Liberty Mutual, and Twin City's demurrer as to

---

[5] The trial court had previously sustained St. Paul's and Liberty Mutual's demurrers to plaintiffs' second amended complaint, but it had granted plaintiffs leave to amend. Twin City's demurrer to the second amended complaint had been sustained in part and overruled in part.

claims involving the third excess policy, without granting further leave to amend.[6]

Plaintiffs appealed the subsequent dismissal of their claims against St. Paul and Liberty Mutual. The Court of Appeal affirmed. (*Fox Paine & Co., LLC v. Liberty Mutual Ins. Co.* (2024) 104 Cal.App.5th 1034 (*Fox Paine*).) Regarding plaintiffs' claims for breach of contract, the Court of Appeal concluded that much of the misconduct asserted by plaintiffs "cannot be breaches of contract, as the alleged wrongs are not within the coverage of the policies." (*Id.* at p. 1046.) As for the failure to pay plaintiffs policy benefits, which plaintiffs also alleged was a breach of the policies, the Court of Appeal found no breach because the relevant policies had not yet " 'attached' " upon exhaustion of all underlying insurance. (*Id.* at p. 1047; see also *id.* at pp. 1047–1048.)

The Court of Appeal also upheld the trial court's ruling rejecting plaintiffs' claims for declaratory relief against St. Paul

---

[6] Plaintiffs' claims against Twin City, as they concerned its first-excess-layer policy, proceeded to trial. Upon St. Paul's request, we have taken judicial notice of the jury verdict form and the trial court's statement of decision following that trial. The verdict form indicates the jury found that "Fox Paine & Company, LLC and Saul Fox [did] suffer a loss all or part of which was covered under the insurance policy with Twin City," but that "Fox Paine & Company, LLC and Saul Fox [did not] give timely notice to Twin City in writing of a Claim as required under the Twin City policy." The statement of decision denied plaintiffs' claim for declaratory relief against Twin City pursuant to the jury's finding that they had not filed a timely claim. Plaintiffs' appeal of the resulting judgment entered in Twin City's favor is currently pending before the Court of Appeal.

and Liberty Mutual. (*Fox Paine*, *supra*, 104 Cal.App.5th at pp. 1049–1052.) First, the appellate court determined that plaintiffs had not adequately alleged an actual controversy between the parties. On this point, the Court of Appeal regarded plaintiffs' allegation that they had "incurred covered 'Loss' and recoverable interest exceeding $43,000,000, not subject to offset" as a conclusion of law that it would not assume to be true. (*Id*. at p. 1050.) The court also noted that the $43 million total included both covered loss and interest, and it stated that Liberty Mutual did not owe interest because its obligation to pay benefits had not yet come due. (*Ibid*.)

In perceiving there to be no actual controversy regarding coverage, the court regarded the situation here as "exactly the same as that in" *Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London* (2008) 161 Cal.App.4th 184 (*Qualcomm*). (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1050.) That earlier case also involved a claim for declaratory relief concerning coverage under an excess insurance policy. In *Qualcomm*, the Court of Appeal affirmed a judgment of dismissal upon concluding that the exhaustion required for the excess policy to attach could not occur due to the insured's settlement with the primary insurer for less than the primary policy's coverage limit. (*Qualcomm*, at p. 189; see also *id*. at pp. 188, 193–203.)

Meanwhile, the Court of Appeal rejected plaintiffs' reliance on *Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592 (*Ludgate*) in support of their argument that they did not have to allege the actual exhaustion of all underlying insurance in order to pursue their claims for declaratory relief against St. Paul and Liberty Mutual. *Ludgate* stated that an insured did not have "to show a reasonable

probability of exhaustion of the primary coverage before it could state a cause of action for declaratory relief against [the insurer] on its excess coverage." (*Id*. at p. 606.) The *Ludgate* court further explained, "Exhaustion of underlying limits, while necessary to entitle the insured to recover on the excess policy, is not necessary to create actual controversy. Exhaustion is merely an issue of proof and entitlement to recovery, not of pleading." (*Ibid*.) The Court of Appeal below described the latter statement as "pure dictum" (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1051) in light of the circumstances that were before the *Ludgate* court, which included the insured's allegation of liabilities in excess of the primary policies' coverage limits and the excess insurer's admissions that an actual controversy existed. (*Ludgate*, at pp. 604–607.)

The Court of Appeal also concluded that St. Paul's and Liberty Mutual's demurrers to the cause of action for declaratory relief had been properly sustained because, had it exercised its discretion, the trial court could have found that such relief was not necessary or proper as to these insurers. (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1052.)[7] The Court of Appeal perceived this cause of action, as alleged against St. Paul, as partly derivative of plaintiffs' breach of contract claim against

---

[7] The Court of Appeal acknowledged that the trial court had not exercised its discretion in sustaining the demurrers as to this cause of action, but it relied on the principle that a Court of Appeal " ' "will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings." ' " (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1045, citing *George v. eBay, Inc.* (2021) 71 Cal.App.5th 620, 628.)

that insurer. (*Ibid.*) The Court of Appeal also stressed that "the outcome of the litigation currently proceeding against Twin City is unknown," and that if one of Twin City's defenses were to prevail, it would not have to pay its full policy limits and exhaustion would never occur as to any of the higher-layer policies. (*Id.* at p. 1053.) A declaration issued under these circumstances, the Court of Appeal reasoned, might constitute "a 'purely advisory opinion based on hypothetical facts or speculative future events,'" and any proceedings associated with the declaration might ultimately prove to be a waste of time and resources. (*Ibid.*) Finally, the court believed that "burdening the excess insurers with prematurely litigating coverage issues before exhaustion upsets insurers' settled expectations" regarding their responsibilities as excess, rather than primary, insurers. (*Ibid.*)

Plaintiffs also failed to persuade the Court of Appeal to revive their claims against St. Paul and Liberty Mutual for tortious breach of the implied covenant of good faith and fair dealing. The Court of Appeal reasoned that plaintiffs' inability to allege exhaustion of the underlying insurance coverage was "fatal" to these claims (*Fox Paine, supra,* 104 Cal.App.5th at p. 1056) because it meant that plaintiffs could not show coverage under the St. Paul and Liberty Mutual policies, as required to support a claim for bad faith (*id.* at p. 1057, citing *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 (*Waller*)).[8]

---

[8] The Court of Appeal also found no error in the trial court's dismissal of the aiding and abetting claim against St. Paul and Liberty Mutual. (*Fox Paine, supra,* 104 Cal.App.5th at pp. 1058–1060.)

Plaintiffs sought review. We granted their petition to clarify whether an insured can pursue declaratory relief and claims for bad faith involving excess insurance policies in circumstances where the underlying insurance coverage has not yet been exhausted.

## II. DISCUSSION

After describing the standard of review, we address plaintiffs' claims for declaratory relief and then consider their claims for tortious breach of the implied covenant of good faith and fair dealing.

### A. Standard of Review

" 'This case comes to us on appeal from the trial court's sustaining of a demurrer. For purposes of reviewing a demurrer, we accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law. We may also consider matters subject to judicial notice.' " (*Capito v. San Jose Healthcare System, LP* (2024) 17 Cal.5th 273, 280.) Furthermore, "On appeal from a judgment of dismissal after the sustaining of a demurrer, a court must 'treat as true not only the complaint's material factual allegations, but also facts that may be implied or inferred from those expressly alleged.' " (*Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 244–245; see also *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 883.) In this posture, " ' "we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action." ' " (*Centinela Freeman Emergency*

*Medical Associates v. Health Net of California, Inc.* (2016)
1 Cal.5th 994, 1010.)

### B. Declaratory Relief

#### 1. *Legal principles*

"Any person interested . . . under a contract" as to which
there is an "actual controversy relating to the legal rights and
duties of the respective parties" may bring an action seeking "a
declaration of rights or duties, either alone or with other relief,"
and a court may then "make a binding declaration of these rights
or duties, whether or not further relief is or could be claimed at
the time." (Code Civ. Proc., § 1060.) Such a declaration "may be
either affirmative or negative in form and effect, and . . . shall
have the force of a final judgment. The declaration may be had
before there has been any breach of the obligation in respect to
which said declaration is sought." (*Ibid.*) Declaratory relief
under Code of Civil Procedure section 1060 is cumulative to
other remedies that may be available. (*Id.*, § 1062.)

" ' "The purpose of a declaratory judgment is to 'serve some
practical end in quieting or stabilizing an uncertain or disputed
jural relation.' " [Citation.] "Another purpose is to liquidate
doubts with respect to uncertainties or controversies which
might otherwise result in subsequent litigation." ' " (*Meyer v.
Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647 (*Meyer*).)

"Code of Civil Procedure section 1060 does not require a
breach of contract in order to obtain declaratory relief, only an
'actual controversy.' Declaratory relief pursuant to this section
has frequently been used as a means of settling controversies
between parties to a contract regarding the nature of their
contractual rights and obligations." (*Meyer, supra*, 45 Cal.4th

at p. 647; see also *Slobojan v. Western Travelers Life Ins. Co.*
(1969) 70 Cal.2d 432, 435; *Aitchison v. Founders Ins. Co.* (1958)
166 Cal.App.2d 432, 440 (*Aitchison*).)  "The 'actual controversy'
referred to in this statute is one which admits of definitive and
conclusive relief by judgment within the field of judicial
administration, as distinguished from an advisory opinion upon
a particular or hypothetical state of facts.  The judgment must
decree, not suggest, what the parties may or may not do." (*Selby
Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110,
117.)  A party seeking declaratory relief "must allege facts from
which the court may determine that an actual controversy
relating to legal rights and duties of the respective parties
exists." (*Lord v. Garland* (1946) 27 Cal.2d 840, 851 (*Lord*).)

"Whether a case is founded upon an 'actual controversy'
centers on whether the controversy is justiciable.  'The principle
that courts will not entertain an action which is not founded on
an actual controversy is a tenet of common law jurisprudence,
the precise content of which is difficult to define and hard to
apply.' " (*Stonehouse Homes LLC v. City of Sierra Madre* (2008)
167 Cal.App.4th 531, 540 (*Stonehouse Homes*).)  Justiciability
incorporates a ripeness component.  (*Vandermost v. Bowen*
(2012) 53 Cal.4th 421, 453.)  " 'A controversy is "ripe" when it
has reached, but has not passed, the point that the facts have
sufficiently congealed to permit an intelligent and useful
decision to be made.' " (*Stonehouse Homes*, at p. 540; see also
*Pacific Legal Foundation v. California Coastal Com.* (1982)
33 Cal.3d 158, 171 (*Pacific Legal Foundation*).)

In determining whether a dispute is ripe enough to involve
an actual controversy permitting declaratory relief, courts have
applied a two-part test drawn from our decision in *Pacific Legal*

*Foundation*, *supra*, 33 Cal.3d at page 171.  This test considers
"(1) whether the dispute is sufficiently concrete that declaratory
relief is appropriate; and (2) whether withholding judicial
consideration will result in the parties suffering hardship."
(*Stonehouse Homes*, *supra*, 167 Cal.App.4th at p. 540.)  " 'Under
the first prong, the courts will decline to adjudicate a dispute if
"the abstract posture of [the] proceeding makes it difficult to
evaluate . . . the issues" [citation], if the court is asked to
speculate on the resolution of hypothetical situations [citation],
or if the case presents a "contrived inquiry" [citation].  Under
the second prong, the courts will not intervene merely to settle
a difference of opinion; there must be an imminent and
significant hardship inherent in further delay.' " (*Ibid.*; see also
*Otay Land Co. v. Royal Indemnity Co.* (2008) 169 Cal.App.4th
556, 562 [" 'Before a controversy is ripe for adjudication it
" 'must be definite and concrete, touching the legal relations of
parties having adverse legal interests' " ' " and " ' " 'admitting of
specific relief through a decree of a conclusive character, as
distinguished from an opinion advising what the law would be
upon a hypothetical state of facts' " ' "].)

Even if an "actual controversy" has been shown (Code Civ.
Proc., § 1060), a trial court has some latitude not to entertain a
claim for declaratory relief.  A court may decline to do so "in any
case where its declaration or determination is not necessary or
proper at the time under all the circumstances."  (*Id.*, § 1061.)
The trial court's discretion to weed out cases in which a
declaration is not necessary or proper extends to the pleading
stage of proceedings.  (See *Meyer*, *supra*, 45 Cal.4th at p. 648;
*Osseous Technologies of America, Inc. v. DiscoveryOrtho
Partners LLC* (2010) 191 Cal.App.4th 357, 372.)  As part of the

"necessary or proper" inquiry (Code Civ. Proc., § 1061), a court may assess whether "resolution of the controversy . . . would have little practical effect in terms of altering parties' behavior," among other relevant considerations. (*Meyer*, at p. 648.)

A trial court's discretion not to entertain a claim seeking declaratory relief "is not boundless," however. (*Meyer*, *supra*, 45 Cal.4th at p. 647.) We have said that when "a case is properly before the trial court, under a complaint which is legally sufficient and sets forth facts and circumstances showing that a declaratory adjudication is entirely appropriate, the trial court may not properly refuse to assume jurisdiction; and if it does enter a dismissal, it will be directed by an appellate tribunal to entertain the action. Declaratory relief must be granted when the facts justifying that course are sufficiently alleged." (*Columbia Pictures Corp. v. DeToth* (1945) 26 Cal.2d 753, 762.) Ultimately, a determination of whether "a declaration of rights and obligations would be unnecessary or improper at the time under all the circumstances . . . rests on the facts in each case" (*Kessloff v. Pearson* (1951) 37 Cal.2d 609, 613), and "doubts regarding the propriety of an action for declaratory relief pursuant to Code of Civil Procedure section 1060 generally are resolved in favor of granting relief" (*Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 433 (*Filarsky*)).

" 'Whether a claim presents an "actual controversy" within the meaning of Code of Civil Procedure section 1060 is a question of law that we review de novo.' " (*Leonard Carder, LLP v. Patten, Faith & Sandford* (2010) 189 Cal.App.4th 92, 97.) When an actual controversy exists, and a trial court has exercised its discretion to grant or deny declaratory relief, " 'a

19

reviewing court will not disturb that exercise of discretion absent abuse.' " (*Ibid.*)

### 2. *Actual controversy*

The insurers advance multiple arguments why this case does not involve an actual controversy. St. Paul asserts that "[t]he non-exhaustion of the underlying policies means this case does not implicate any 'present' controversy" over indemnification under its policy. Liberty Mutual, meanwhile, argues that plaintiffs have not alleged an actual controversy as to coverage under its policy because their allegations fail to show a covered loss in an amount that will reach its policy. Both insurers also stress that plaintiffs' legal battle with the Paine Parties concluded several years ago. They take the position that declaratory relief is no longer necessary, if it ever was, to guide plaintiffs' conduct in connection with that litigation.

We address these arguments in turn. As we explain below, actual controversies regarding coverage and liability under the St. Paul and Liberty Mutual policies may exist here even though the coverage beneath these policies has not been fully exhausted. Plaintiffs bear the burden, however, of adequately pleading a covered loss sufficient to create an actual controversy regarding each excess policy in light of its attachment point. We explain what this burden entails, and remand this case to the Court of Appeal to determine whether plaintiffs have satisfied it. Finally, we conclude that an actual controversy may exist here notwithstanding the cessation of the earlier litigation.

a. *The exhaustion of underlying insurance is not
   necessary for an actual controversy to exist
   regarding coverage under an excess insurance
   policy*

We first address whether, as St. Paul argues, plaintiffs were required to allege that all of the insurance coverage underlying its policy had been exhausted in order to satisfy the "actual controversy" requirement for declaratory relief. (Code Civ. Proc., § 1060.) We consider, among other things, whether a failure to exhaust, by itself, makes a dispute over coverage too abstract and unsuitable for declaratory relief, and whether a refusal to entertain claims for declaratory relief if exhaustion has not occurred would impose a significant hardship on the parties. (*Pacific Legal Foundation*, *supra*, 33 Cal.3d at p. 171; *Stonehouse Homes*, *supra*, 167 Cal.App.4th at p. 540.)

An actual controversy over insurance coverage may exist even when coverage depends on the satisfaction of a future contingency or contingencies. (See Code Civ. Proc., § 1060 [the court may "make a binding declaration of . . . rights or duties, whether or not further relief is or could be claimed at the time"].) In fact, "Actions for declaratory judgment in the insurance context nearly always depend upon several contingencies." (*Tocci Bldg. Corp. of New Jersey v. Virginia Sur.* (D. Mass. 2010) 750 F.Supp.2d 316, 321 (*Tocci*); see also *E.R. Squibb & Sons, Inc. v. Lloyd's & Companies* (2d Cir. 2001) 241 F.3d 154, 177 (*E.R. Squibb*).) While at some point these contingencies may become so great that no actual controversy will be found to exist (see *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2015) 237 Cal.App.4th 23, 29–30), the mere fact "[t]hat . . . liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action. [Citations.] Rather, courts should

focus on 'the practical likelihood that the contingencies will occur . . . .' [Citations.] Indeed, litigation over insurance coverage has become the paradigm for asserting jurisdiction despite 'future contingencies that will determine whether a controversy ever actually becomes real.'" (*Associated Indemnity Corp. v. Fairchild Industries, Inc.* (2d Cir.1992) 961 F.2d 32, 35 (*Fairchild Industries*).)

Consistent with these general principles, a lack of exhaustion does not categorically make a coverage dispute involving an excess policy unduly abstract or hypothetical. Imposing a blanket exhaustion prerequisite for the recognition of an actual controversy would place too much emphasis on the fact that a contingency exists, and too little on the likelihood it will occur.

In many respects, the circumstances here bear the basic hallmarks of a concrete dispute over insurance coverage that would support a claim for declaratory relief. Plaintiffs allege that: (1) they suffered a loss; (2) the loss is covered by specific policy provisions described in the complaint; (3) they submitted "virtually all of their invoices" to defendants, seeking reimbursement; but (4) defendants have failed to reimburse them for these losses. Plaintiffs also allege generally that they have performed all of the obligations assigned to them under the policies except to the extent the excess insurers prevented them from doing so. In cases involving a single insurance policy, courts have found that similar allegations established a ripe dispute regarding coverage under the policy. (See, e.g., *Aetna Life Ins. Co. v. Haworth* (1937) 300 U.S. 227, 242 (*Haworth*) [an actual controversy permitting declaratory relief existed where an insurance claim was made and disputed; the dispute was

"definite and concrete, not hypothetical or abstract"]; *Aitchison*,
*supra*, 166 Cal.App.2d at p. 440.)

The fact that this case involves several layers of excess
insurance, each with its own exhaustion requirement,
introduces a wrinkle but does not foreclose the existence of an
actual controversy.  A dispute can be ripe, and a court can
provide sufficiently clear and directive declarations of rights and
responsibilities under multiple excess policies, even though
coverage under these policies is contingent on the exhaustion of
all underlying insurance.

Here, viewed at the time of the ruling on the demurrers,
the array of claims alleged by plaintiffs against the excess
insurers was conducive to the issuance of useful declarations
regarding the excess policies.  Plaintiffs asked for a
determination regarding whether the HCC policy is exhausted;
they alleged a breach of contract claim against Twin City, the
first-excess-layer insurer; and they requested findings
regarding the liability of each excess insurer.  The trial court
was well positioned to determine matters of coverage common
to all policies, rule on defenses to coverage, and ascertain each
excess insurer's liability, if any.  It could have then issued
appropriately tailored declarations enforceable as final
judgments.  (Code Civ. Proc., § 1060.)  Contingencies associated
with each policy's exhaustion requirement could have been
incorporated within these declarations through appropriate
language explaining when any coverage responsibilities
recognized by the court would become due.  (See *Southern
Counties Gas Co. v. Ventura Pipeline Constr. Co.* (1971)
19 Cal.App.3d 372, 381 ["in actions for declaratory relief future
and contingent legal rights may be encompassed by the relief

therein granted"].) And plaintiffs' ability to enforce these declarations as judgments would have added to the likelihood that these contingencies would happen.

St. Paul's argument that exhaustion is required before there is a ripe dispute also implicates the hardship component of the actual controversy inquiry. Treating a lack of exhaustion as sufficient on its own to defeat a claim for declaratory relief would impose a significant hardship on insureds such as plaintiffs, require unnecessary and wasteful proceedings, and lead to potentially inconsistent outcomes. If that were the rule, insureds seeking recovery against multiple excess insurers would have to engage in piecemeal litigation, scaling the tower of excess insurance policy-by-policy by securing a favorable judgment against each excess insurer, executing upon it, filing a new lawsuit against the next insurer in the queue, and repeating this process until they reached the summit. Such onerous, time-consuming, and expensive proceedings would pose a serious risk of deterring insureds from ever pursuing their rights against excess insurers and compromise the ability of insureds to vindicate these rights.

Granted, there is some risk that allowing claims for declaratory relief against excess insurers to proceed while litigation against lower-layer insurers remains pending will require the former to remain enmeshed in litigation that might prove unnecessary as to them. This potential inconvenience can be minimized by the trial court, however (see *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 (*Rutherford*) ["courts have . . . [the] inherent power to control litigation before them"]), and is more than counterbalanced by the hardships

that would be imposed on insureds by forcing them to proceed sequentially against the excess insurers.

Moreover, as noted by amicus curiae United Policyholders, a rule requiring seriatim proceedings when excess insurance is involved might impose an inconvenience on insureds and insurers alike. Requiring individual actions to be brought against individual insurers at different times and, potentially, in different jurisdictions poses a heightened risk of conflicting rulings that could make the parties' rights and responsibilities under insurance policies more difficult to ascertain and act upon. Particularly in disputes such as this, involving excess insurance policies that "follow form" as to the primary policy, it invites mischief to require multiple courts, at multiple times, to interpret the very same provisions appearing within the primary policy, as is necessary to determine the existence of coverage under the excess policies.

We conclude from the foregoing that plaintiffs' inability to allege the exhaustion of all coverage underlying the St. Paul and Liberty Mutual policies is not by itself fatal to their claims for declaratory relief against these insurers.

> b. *A party seeking declaratory relief regarding coverage under an excess policy must adequately allege covered losses implicating that policy*

As noted, Liberty Mutual argues that plaintiffs have failed to plead an actual controversy as to coverage and liability under its policy because they have not properly alleged covered losses sufficient to reach this policy, with its $40 million attachment point.

In addressing this argument, we reiterate that a party seeking declaratory relief bears the burden of showing the existence of an actual controversy. (*Lord, supra*, 27 Cal.2d at p. 851; *Boosman v. United Bldg. Co.* (1952) 109 Cal.App.2d 486, 488.) When the declaratory relief sought involves findings regarding coverage and liability under an excess insurance policy, it must be adequately alleged that the insured's covered losses are sufficient to reach that policy. Otherwise, any disagreement regarding coverage and liability is merely academic because the plaintiff has provided no reason to believe that the contingency of reaching the excess policy's attachment point will occur.

What constitutes a sufficient allegation of covered losses for purposes of surviving a demurrer depends on the circumstances. In situations in which the total amount of an insured's allegedly covered losses is already known prior to the filing of a complaint, an insured seeking declaratory relief may reasonably be expected to plead this amount and what the covered losses consist of. These allegations can then be compared with the attachment point of the excess policy for which a judicial declaration is sought. Absent other grounds for concluding that the excess policy cannot attach as a matter of law, when the amount of allegedly covered losses is sufficient to reach that policy, it is certain enough for pleading purposes that the contingency of meeting the excess policy's attachment point will come to pass.

The situation is different when the complaint alleges that an insured's covered losses are fully known, or that is the only reasonable inference one can draw from the factual allegations in the complaint, and these losses do not reach an excess policy's

attachment point. In that circumstance, further proceedings on a cause of action seeking declaratory relief regarding coverage or liability under the policy are typically unjustified, at least when there are no additional claims from other claimants on the underlying insurance that will boost the insured's allegedly covered losses up the insurance tower to reach the excess policy. When the insured's allegedly covered losses are fully known yet fall short, the excess policy will not attach even assuming that the plaintiff's allegations are true, meaning that the request for declaratory relief is properly rejected at the pleading stage due to the lack of an actual controversy regarding coverage or liability under the policy. (See *Gilbert v. State of California* (1990) 218 Cal.App.3d 234, 248 ["to state a cause of action for declaratory relief, there must arguably be a right . . . or a duty"]; cf. *Childhelp, Inc. v. City of Los Angeles* (2023) 91 Cal.App.5th 224, 236 [" 'a trial court may properly sustain a general demurrer to a declaratory relief action without leave to amend when . . . the controversy presented can be determined as a matter of law' "].)

The more difficult cases involve situations in which it is unknown whether an insured's allegedly covered losses are enough to reach an excess policy. For example, an insured may be faced with mounting liabilities or losses that have not yet been fully ascertained; or there may be uncertainty regarding the extent to which claims presented by other insureds will draw upon lower-layer policies and contribute to their exhaustion.

Faced with such uncertainty, in evaluating whether an actual controversy exists regarding excess coverage it remains appropriate at the pleading stage to examine allegations of covered losses or liabilities in light of the pertinent policy's

attachment point. But in these kinds of situations courts have viewed allegations of losses or liabilities from a somewhat different perspective, applying a standard that allows for recognition of an actual controversy even if it is not yet certain that an insured's claims will ultimately reach an excess policy.

Under this approach, as applied to uncertain liabilities, "for a declaratory judgment coverage action involving an excess policy to be ripe, it must be practically or reasonably likely that the insured's potential liability will reach into the excess coverage; absolute proof that the policies will be triggered is not required." (*Liberty Mutual v. Lone Star Industries* (Conn. 2009) 967 A.2d 1, 31 (*Lone Star*); accord, *E.R. Squibb*, *supra*, 241 F.3d at p. 177; *Eaton Corp. v. Westport Ins. Co.* (E.D. Wis. 2021) 567 F.Supp.3d 1029, 1038; *Century Indemnity Co. v. Marine Group, LLC* (D.Or. 2012) 848 F.Supp.2d 1229, 1235–1236; *Tocci*, *supra*, 750 F.Supp.2d at pp. 321–323; *Hoechst Celanese v. National Union Ins.* (Del.Super. 1992) 623 A.2d 1133, 1137; *State Farm Fire & Cas. Co. v. LiMauro* (N.Y.App.Div. 1984) 103 A.D.2d 514, 518.)

In performing this " 'reasonable likelihood' " analysis, " 'there is no precise formula or line of demarcation, as each case presents unique facts and circumstances.' " (*Tocci*, *supra*, 750 F.Supp.2d at p. 322.) "[T]he 'worst case or highest estimate of damages . . . may be used to ascertain whether or not a claim is justiciable against a particular insurer's policy . . . .' " (*Lone Star*, *supra*, 967 A.2d at p. 32.) Allegations regarding additional claimants on the underlying policies and other facts and circumstances that may affect whether an insured's losses or liabilities will reach an excess policy can also inform the analysis.

In undertaking the reasonable likelihood inquiry at the pleading stage, a court should not give undue weight to what are at that juncture only *potential* defenses to coverage that may prove successful in future proceedings and ultimately prevent exhaustion.  One court, for example, has explained at this phase, "[t]hat the insured has not yet proven with certainty that the primary coverage extends to the claims against it does not render the claim [against the excess policy] unripe" (*Tocci, supra*, 750 F.Supp.2d at p. 323), adding that "[c]ourts have refrained from making a detailed examination of the policy terms and exclusions when determining whether there is a 'practical likelihood' that the primary limit could be exceeded" (*ibid.*).  The same court observed that "[s]uch an inquiry . . . is better left to a later stage in the litigation." (*Ibid.*)

The reasonable likelihood standard harmonizes with the rationales behind the actual controversy requirement within Code of Civil Procedure section 1060.  It does not indulge obviously spurious controversies yet simultaneously avoids the hardships that could result from withholding declaratory relief in situations where an insured may be uncertain whether its losses or liabilities will reach an excess policy but nevertheless needs to secure a judicial determination regarding whether there is coverage under that policy.

We therefore agree with the decisions cited above and conclude that in situations involving uncertainties material to whether an insured's losses or liabilities are sufficient to reach an excess policy, the reasonable likelihood approach provides an appropriate method at this stage of the proceedings for determining whether the contingency associated with reaching the policy's attachment point is sufficiently likely to occur.  But

as previously explained, a different standard applies when no comparable uncertainties exist. In either situation, of course, additional circumstances relevant to the existence of an actual controversy regarding coverage or liability under an excess policy, such as the assertion of defenses that establish as a matter of law at the pleading stage that exhaustion cannot occur, must also be taken into consideration when they are properly before the court.

These principles find support in the substance of prior decisions applying California law, even though certain language within those opinions might be read to suggest different standards for determining when an actual controversy regarding excess insurance coverage has been shown.

As previously alluded to, one of these decisions, *Ludgate*, *supra*, 82 Cal.App.4th 592, stated that an insured did not have "to show a reasonable probability of exhaustion of the primary coverage before it could state a cause of action for declaratory relief against [the insurer] on its excess coverage" (*id*. at p. 606) and that "[e]xhaustion of underlying limits, while necessary to entitle the insured to recover on the excess policy, is not necessary to create actual controversy. Exhaustion is merely an issue of proof and entitlement to recovery, not of pleading" (*ibid*.).

To the extent that *Ludgate* determined that an insured need not allege the actual exhaustion of all underlying insurance to state a viable cause of action for declaratory relief regarding an excess insurance policy, its analysis is consistent with ours. Insofar as the language quoted above also could be read as taking the position that an insured does not have to allege a sufficient covered loss to show an actual controversy, it

must be understood in context. These statements were not
critical to the outcome in *Ludgate* because in that case the
insured's cross-complaint "sufficiently alleged exhaustion of
underlying limits." (*Ludgate*, *supra*, 82 Cal.App.4th at p. 606.)
Together with the excess insurer's admissions in its own
complaint seeking declaratory relief, the insured's allegations
regarding prior losses and anticipated liabilities well in excess
of the primary policies' coverage limits were deemed sufficient
in *Ludgate* to show that an actual controversy existed, at least
for purposes of a motion for judgment on the pleadings. (*Id.* at
pp. 603–604, 606–608.) Notwithstanding the broader language
appearing elsewhere in its opinion, the *Ludgate* court ultimately
concluded only that under the circumstances "requiring [the
insured] to allege *additional* facts to establish reasonable
probability of exhaustion and actual controversy was
superfluous and served no useful purpose." (*Id.* at p. 608, italics
added.)

*Lockheed Martin Corp. v. Continental Ins. Co.* (2005)
134 Cal.App.4th 187 involved subsequent proceedings in the
same litigation that had led to the *Ludgate* decision. It
described *Ludgate* as having held that "Code of Civil Procedure
section 1060 . . . does not require an insured to show a
reasonable probability of exhaustion of its primary coverage
before it may state a cause of action for declaratory relief against
an excess insurer." (*Id.* at p. 220.) This statement must also be
understood as having the facts involved in *Ludgate* in mind.
Nevertheless, because language in both decisions could be read
as endorsing a pleading rule contrary to the principles we have
articulated, we disapprove both *Ludgate Ins. Co. v. Lockheed
Martin Corp.*, *supra*, 82 Cal.App.4th 592, and *Lockheed Martin*

*Corp. v. Continental Ins. Co.*, *supra*, 134 Cal.App.4th 187, to the extent they could be so construed.

Likewise, to the extent that language in *Iolab Corp. v. Seaboard Surety Co.* (9th Cir. 1994) 15 F.3d 1500 (*Iolab*) has been perceived as asserting another seemingly conflicting rule regarding the availability of declaratory relief, it too must be read in context. In *Iolab*, the insured settled a lawsuit for a sum less than the total amount of its primary insurance coverage. (*Id.* at p. 1503.) The insured then brought suit seeking indemnification from more than a dozen primary and excess insurers. (*Id.* at p. 1502.) The trial court dismissed the plaintiff's claims against some insurers and entered summary judgment in favor of the other insurers. (*Id.* at p. 1503.) The federal Court of Appeals affirmed. (*Id.* at p. 1507.) As relevant here, as to the excess insurers the appellate court found no error in the district court's rejection of the plaintiff's breach of contract claims, nor in the lower court's failure to recharacterize the suit as an action seeking declaratory relief. (*Id.* at pp. 1504–1505.) The *Iolab* court stated "that under California law, [the insured plaintiff] was required to exhaust its primary coverage and to establish that the [allegedly covered] loss exceeded that coverage prior to bringing suit against the excess insurers." (*Id.* at p. 1502.) Regarding declaratory relief, *Iolab* reasoned that requiring the excess insurers to defend against such a cause of action would impose upon them "the unnecessary cost of litigating a claim that may never trigger excess coverage." (*Id.* at p. 1505.)

The analysis in *Iolab* has "spawned some disagreement regarding whether plausible allegations that the [insurance] claim might invade the excess coverage create a justiciable claim

[for declaratory relief] or whether the insured must allege that the primary coverage actually has been exhausted." (*Sinanian Development, Inc. v. Admiral Insurance Company* (C.D.Cal. Sept. 30, 2024, No. CV 24-232-DMG (MRWx)) 2024 WL 5316978 at p. *4.) As we have explained, actual exhaustion of all underlying insurance is *not* required for an insured to pursue a declaratory relief claim against an excess insurer.

Yet as with *Ludgate*, the *Iolab* court's disposition of the dispute before it suggests some common ground with our decision. On multiple occasions *Iolab* indicated that the plaintiff had not put forward facts at summary judgment sufficient to show that the excess policies would ever attach. (See *Iolab*, *supra*, 15 F.3d at pp. 1505 [stating that the plaintiff "has not established that the . . . loss will ever trigger excess coverage"], 1507 [making the same observation].) As we have explained, it is appropriate to reject a declaratory relief claim due to the absence of an actual controversy when an insured alleges a fully known loss or liability that is insufficient to reach an excess policy's attachment point. (Accord, *Qualcomm*, *supra*, 161 Cal.App.4th at pp. 188, 193–203.) *Iolab*'s focus on the amount of covered liability or loss therefore harmonizes with the principles we have articulated, even if some of the language in that opinion incorrectly communicated that actual exhaustion of all underlying insurance is necessary to pursue a claim for declaratory relief against an excess insurer.

c. *Further proceedings on remand*

We remand this cause to the Court of Appeal to reevaluate the adequacy of plaintiffs' allegations as they bear upon the existence of an actual controversy. That court shall address whether plaintiffs must allege a covered loss that reaches an

excess policy's attachment point in order to state an actual controversy involving that policy, or whether additional considerations justify application of the reasonable likelihood approach here. Once the appropriate standard has been identified that court shall determine whether it has been met.

To assist with proceedings on remand, we take this opportunity to provide further guidance regarding plaintiffs' allegation that they "incurred covered 'Loss' and recoverable interest exceeding $43,000,000, not subject to offset." The Court of Appeal rejected this allegation as a conclusion of law that it would not assume to be true. (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1050.) The Court of Appeal also found this allegation to be defective because it included interest along with covered loss. (*Ibid*.)

We agree with the Court of Appeal that this allegation is flawed, but only because it commingles covered loss with recoverable interest. The allegation is not objectionable insofar as it describes a particular amount of loss as "covered." It is true that this language asserts a legal conclusion that plaintiffs' losses are covered by the insurance policies — making it, in a sense, a conclusion of law. Nonetheless, when a representation that a loss is "covered" is supported by other allegations in a complaint that describe what the loss involves and the policy provisions that allegedly provide coverage — both of which appear in plaintiffs' complaint — it has enough of a factual basis to be credited at the pleading stage and inform a court's assessment of whether the insured's losses will reach, or are reasonably likely to reach, an excess policy. (Cf. *Endeavor Operating Co., LLC v. HDI Global Ins. Co.* (2023) 96 Cal.App.5th 420, 442 [a bare allegation within a complaint

that certain losses are "covered" by an insurance policy may be rejected as a conclusion of law when it is contradicted by the policy itself].)

On the other hand, the allegation's commingling of covered loss and recoverable interest presents a problem. This averment does not allege that plaintiffs suffered over $43 million in covered loss. It alleges that plaintiffs have "incurred" over $43 million in covered loss *and recoverable interest*. The Court of Appeal stated that the incorporation of interest in the $43 million figure provided another reason why it could not conclude that plaintiffs' losses reached the Liberty Mutual policy. (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1050.) It explained, "Liberty Mutual does not owe interest as a matter of law, as the underlying policies have not been exhausted, and thus Liberty Mutual's performance not come due." (*Ibid.*)

The fundamental problem with including interest in the $43 million figure is not that Liberty Mutual does not owe interest as a matter of law, an issue we need not address here. It is that — as indicated by the distinction the allegation draws between them — covered loss and recoverable interest are two different things,[9] and only covered loss contributes to the exhaustion of coverage limits and is thereby capable of causing

---

[9] The HCC policy defines "Loss" as "damages, settlements and Costs, Charges and Expenses incurred by any of the Insureds, including punitive, exemplary or multiplied damages; provided, however, that such punitive, exemplary or multiplied damages are insurable pursuant to any applicable law." "Costs, Charges and Expenses" is defined within the policy as "reasonable and necessary legal fees and expenses (including expert fees) and cost of attachment or similar bonds incurred by the Insureds in defense of any Claim."

higher-layer policies to attach. The Court of Appeal understood the complaint's reference to "recoverable interest" as referring to prejudgment interest on policy benefits that plaintiffs claim to be owed. (*Fox Paine, supra*, 104 Cal.App.5th at p. 1050; see Civ. Code, § 3287, subd. (a).) Plaintiffs have not argued that this characterization was mistaken. Neither plaintiffs' complaint nor their briefs identify any provisions within the insurance policies involved here or any legal authority under which prejudgment interest owed by *other* insurers could cause St. Paul's or Liberty Mutual's policies to attach when they otherwise would not.[10] The issue with including interest in the $43 million figure is therefore even more fundamental than described by the Court of Appeal. The commingling of loss and interest obscures the number that matters for purposes of ascertaining whether the underlying policies are capable of being exhausted, which is the amount of covered loss.

Plaintiffs argue that we cannot assume at this juncture their covered losses will be *insufficient* to reach both the St. Paul and the Liberty Mutual policies. This argument misunderstands their burden to plead an actual controversy and asks the court to read into their complaint an allegation — that they have incurred a certain amount of covered loss *alone* — they have not pleaded. (See *American Tel. & Tel. Co. v. California Bank* (1943) 59 Cal.App.2d 46, 54 ["[i]t is not to be

---

[10]   In their merits briefing here, plaintiffs argued only that the Court of Appeal erred in "finding interest was not recoverable." They did not develop an argument that interest constitutes covered loss under the policies or that the Court of Appeal misread this allegation and the $43 million figure includes only loss, and not interest.

assumed from" the rule requiring liberal construction of a
pleading "that by construction there may be inserted in a
pleading vital pretermitted averments or averments which are
neither directly set forth therein nor reasonably within the fair
import of the language of those which are set forth"].) While at
this point in the proceedings we must accept as true those
inferences that can be reasonably drawn from a complaint's
factual allegations, whether or not plaintiffs' allegation of $43
million of covered loss and recoverable interest is reasonably
read to imply the distinct fact that there was at least a certain
amount of covered loss remains to be determined. Plaintiffs'
argument that we must assume a sufficient covered loss would,
if accepted, create a loophole in the pleading standards that we
described earlier in this opinion by allowing parties seeking
declaratory relief to obscure the amount of covered loss in their
pleadings by alleging only similarly blended sums.

We leave it to the Court of Appeal to determine in the first
instance whether to parse plaintiffs' allegation of over
$43 million in covered loss and recoverable interest into
separate components and, if so, what amount of covered loss can
reasonably be inferred from this allegation.[11] If subsequent

---

[11] In proceedings before this court, we raised the question of
whether other allegations in the complaint describing
approximately $19 million in prior payments to the Paine
Parties may be relevant to whether plaintiffs' allegedly covered
losses reach, or are reasonably likely to reach, the St. Paul and
Liberty Mutual policies by possibly contributing toward the
exhaustion of underlying insurance coverage. Although we
decline to address this possibility in light of plaintiffs' failure to
develop this argument in their briefing, the topic may be
revisited on remand.

proceedings establish that plaintiffs have not alleged an actual controversy but plaintiffs could cure this deficiency through amendment of their complaint, they should be granted leave to amend. (See *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 970–971 (*Aubry*) [upon review of an order sustaining a demurrer without leave to amend, a reviewing court can grant leave to amend even without an express request that it do so].)

> d. *An actual controversy may exist notwithstanding the absence of ongoing litigation between plaintiffs and the Paine Parties*

We also address one other argument raised by St. Paul and Liberty Mutual for why no actual controversy appears here. Both insurers observe that the litigation between the Fox Parties and the Paine Parties had already concluded by the time this case was filed. Noting our statement in *Meyer* that " ' "[o]ne test of the right to institute proceedings for declaratory judgment is the necessity of present adjudication as a guide for [a] plaintiff's future conduct in order to preserve his legal rights" ' " (*Meyer*, *supra*, 45 Cal.4th at p. 647), the insurers argue that declaratory relief is unnecessary to " ' "guide" ' " plaintiffs' " 'future conduct' " in that litigation (*ibid.*).

This argument focuses on the wrong controversy. As plaintiffs explain, here we are concerned with "the disputed *insurance* liability, not the party disputes in the underlying action." The declaratory relief sought by plaintiffs would resolve a " ' " 'disputed jural relation' " ' " between plaintiffs and the excess insurers (*Meyer*, *supra*, 45 Cal.4th at p. 647) by clarifying whether liability exists under the policies to cover plaintiffs' previously incurred litigation costs. (See, e.g., *Haworth*, *supra*,

300 U.S. at p. 242.) Declaratory relief would be sufficiently forward looking (see *Meyer*, at p. 647) insofar as it would either recognize future payment obligations owed by the excess insurers upon the exhaustion of underlying insurance, or declare that they have no responsibility in the future to pay plaintiffs benefits under their policies. Accordingly, we conclude that the winding down of the litigation between the Fox Parties and the Paine Parties does not mean there is no actual controversy to resolve.

### 3. *Declaratory relief was neither unnecessary nor improper under the circumstances*

After determining that plaintiffs had not demonstrated the existence of an actual controversy, the Court of Appeal went further and identified several reasons why the trial court could have concluded that declaratory relief was not "necessary or proper" (Code Civ. Proc., § 1061) here. (*Fox Paine*, *supra*, 104 Cal.App.5th at pp. 1052–1053.) The Court of Appeal's reasoning, if accepted, could significantly limit the availability of declaratory relief involving excess insurance policies. After considering each of these rationales, we conclude that none is persuasive here.

First, the Court of Appeal viewed "at least two aspects of plaintiffs' declaratory relief claim [as] derivative of other claims" (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1052), explaining, "the [third amended complaint] requests declaratory relief 'that St. Paul's policy . . . is triggered by the exhaustion of the "first layer" Twin City policy and plaintiffs' losses,' a request obviously derivative of plaintiffs' breach of contract claim. Likewise plaintiffs' request for a declaration that St. Paul 'waived' its

right to rely on the exhaustion provision or is 'estopped' from requiring it." (*Ibid.*)

The perceived overlap in plaintiffs' claims did not provide good reason to regard declaratory relief as unnecessary or improper here. Plaintiffs' breach of contract claims against St. Paul and Liberty Mutual, which the Court of Appeal determined could *not* proceed at this time, do not overlap with their declaratory relief claims against these defendants to any great degree. Claims for declaratory relief are not dependent on whether there has been a breach of contract. (See Code Civ. Proc., § 1060 ["The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought"].) More fundamentally, "The mere circumstance that another remedy is available is an insufficient ground for refusing declaratory relief" (*Filarsky*, *supra*, 28 Cal.4th at p. 433) without further consideration of the adequacy of the respective remedies and other relevant circumstances. (See, e.g., *Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 732 ["all agree that before a court may properly exercise its discretion to refuse [declaratory] relief on" the ground that another remedy exists, "it must clearly appear that the asserted alternative remedies are available to the plaintiff and that they are speedy and adequate or as well suited to the plaintiff's needs as declaratory relief"].) As already observed, the maintenance of a single action that includes claims for declaratory relief has significant advantages relative to the alternative of piecemeal litigation involving serial lawsuits against the excess insurers. (See *Warren v. Kaiser Foundation Health Plan, Inc.* (1975) 47 Cal.App.3d 678, 683–684 ["A lawsuit for breach of contract is neither as speedy and adequate nor as well suited as declaratory

relief to the plaintiff's needs where, despite the breach . . . the use of declaratory relief will avoid a multiplicity of suits that may ensue if a different remedy is pursued"].)

Next, the Court of Appeal stated that "declaratory relief [wa]s not proper" because "the outcome of the litigation currently proceeding against Twin City is unknown. That litigation includes a claim for breach of contract, as to which Twin City has asserted several defenses. And if one or more of the defenses succeed, it will mean that Twin City would not have to pay its full $10 million policy limits. So, keeping the excess insurers in the case would raise the prospect of what we described as a 'purely advisory opinion based on hypothetical facts or speculative future events.' " (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1053.)

Twin City's mere assertion of defenses did not justify a refusal to entertain plaintiffs' claims for declaratory relief against St. Paul and Liberty Mutual. While the *successful* assertion of a defense by an underlying insurer that would prevent coverage from ever attaching under a higher-layer excess policy could render nugatory further proceedings on a declaratory relief claim seeking findings regarding coverage and liability under that policy, on demurrer the trial court rejected all of Twin City's defenses other than its exhaustion defense (as to the third-layer excess policy) and it allowed plaintiffs' claims against that insurer to proceed insofar as its first-excess-layer policy was involved. Of course, Twin City later prevailed on a notice defense at trial, and it remains possible that the resulting judgment will hold up on appeal. If so, plaintiffs' claims for declaratory relief against St. Paul and Liberty Mutual (assuming the Court of Appeal finds these claims to have been

adequately alleged) may no longer be necessary or proper. But at the time of the ruling on the demurrers, the possibility that these defenses might later prove meritorious did not provide a sufficient reason to reject plaintiffs' declaratory relief claims against St. Paul and Liberty Mutual.

Relatedly, the Court of Appeal raised concerns about having declaratory relief claims against St. Paul and Liberty Mutual proceed to trial "alongside" the claims against Twin City. (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1053.) The court observed that the adjudication of the former claims would be a waste of the insurers' time, as well as that of the trial court, if Twin City were to prevail at trial. (*Ibid*.) This consideration focused entirely on what would happen *if* Twin City were to prevail, and thus once again placed too much emphasis on that insurer's assertion of defenses to liability. Furthermore, this concern is outweighed here by the potential waste of time, effort, and resources that would be involved with serial litigation, particularly considering the various tools that a trial court has to effectively manage the cases before it. (See *Rutherford*, *supra*, 16 Cal.4th at p. 967; *California Bank v. Diamond* (1956) 144 Cal.App.2d 387, 390 ["in a case such as this where a multiplicity of actions would result unless the rights of the parties were first declared and relief given accordingly in the same action, it would be an abuse of discretion to deny relief"].) There is no fixed requirement, for example, that all of a plaintiff's declaratory relief claims against multiple defendants must proceed in lockstep "alongside" each other. (*Fox Paine*, at p. 1053.) As appropriate, these claims can be developed and decided in another sequence that is both fair and efficient under the circumstances.

The Court of Appeal also opined that "there are sound policy reasons why the excess insurers should stay on the sidelines without incurring . . . unnecessary costs" associated with declaratory relief proceedings brought before their policies have attached. (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1053.) It explained, "A strict exhaustion requirement brings stability and predictability to the excess insurance system, both for insurers and insureds. . . . Thus, burdening the excess insurers with prematurely litigating coverage issues before exhaustion upsets insurers' settled expectations." (*Ibid*.) Our holding today imposes no undue hardship on excess insurers, who themselves may benefit from the certainty provided by timely judicial declarations regarding coverage under excess policies. The requirement that an insured seeking declaratory relief allege losses that, at a minimum, give rise to a reasonable likelihood of coverage accommodates both the insured's interest in securing judicial declarations regarding coverage and liability and the excess insurer's interest in not being unnecessarily entangled in litigation over an insurance policy that is highly unlikely to ever attach. Also, with numerous decisions already having adopted a reasonable likelihood standard (e.g., *E.R. Squibb*, *supra*, 241 F.3d at p. 177; *Tocci*, *supra*, 750 F.Supp.2d at pp. 321–323), our holding will not disrupt any settled expectations among insurers nationwide or destabilize the field of excess insurance. Lastly, as we have already emphasized, any benefits that might follow from a strict exhaustion requirement would come with even greater drawbacks to insureds, who would face the daunting prospect of having to file multiple separate lawsuits to recover under a series of excess policies.

Finally, we address the argument that the trial court could have relied on the absence of ongoing litigation between plaintiffs and the Paine Parties to conclude that declaratory relief was not necessary or proper here. We find this argument unpersuasive for essentially the same reasons we provided earlier in this opinion in concluding that such litigation was not essential to the existence of an actual controversy. If the requirements for an actual controversy are met, declaratory relief remains appropriate to resolve contested liability issues between plaintiffs and the excess insurers even if these declarations could not inform plaintiffs' strategic decisions in the earlier litigation.

To summarize, whether viewed individually or collectively, the rationales advanced by the Court of Appeal and the excess insurers do not justify the rejection of plaintiffs' declaratory relief claims at the pleading stage on the ground that such relief is not necessary or proper under the circumstances.

## C. Bad Faith

The second issue presented for review concerns plaintiffs' claims against St. Paul and Liberty Mutual for tortious breach of the implied covenant of good faith and fair dealing. The Court of Appeal determined that St. Paul's and Liberty Mutual's demurrers to these claims were properly sustained because plaintiffs "have . . . not alleged exhaustion under the excess policies, and thus no coverage, a failure fatal to their claim for bad faith." (*Fox Paine*, *supra*, 104 Cal.App.5th at p. 1056.) The Court of Appeal rejected plaintiffs' argument "that 'exhaustion is [not] an element plaintiffs must prove to state a bad faith claim," explaining that "plaintiffs concede that an element of

bad faith is that 'all of the conditions required for defendant's performance had occurred,' and one such 'condition' that must have 'occurred' before St. Paul had a duty to 'perform' is that the underlying policy, i.e., the Twin City policy, be exhausted." (*Id.* at p. 1058.)

### 1. *Legal principles*

"It has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' [Citation.] This principle applies equally to insurance policies, which are a category of contracts." (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400 (*Kransco*).) The covenant of good faith and fair dealing "is based on general contract law and the long-standing rule ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." ' " (*Waller*, *supra*, 11 Cal.4th at p. 36.) "In sum, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." (*Ibid.*) "The precise nature and extent of the duty imposed by the implied covenant depends on the nature and purpose of the underlying contract and the legitimate expectations of the parties arising from the contract." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2025) ¶ 12:28, p. 12-8.)

The covenant of good faith and fair dealing inheres in insurance policies, like other contracts. A breach of the covenant in the insurance context is distinctive, though, in that it may allow an aggrieved insured to recover the more generous

damages that are associated with tort claims. "[A]n insurer's denial of or delay in paying benefits gives rise to tort damages[, but] only if the insured shows the denial or delay was unreasonable." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723 (*Wilson*); see also *Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 973.) "The availability of tort remedies in the limited context of an insurer's breach of the covenant advances the social policy of safeguarding an insured in an inferior bargaining position who contracts for calamity protection, not commercial advantage." (*Kransco*, *supra*, 23 Cal.4th at p. 400, italics omitted.)

In taking the position that plaintiffs could not state a claim for bad faith against an excess insurer without alleging exhaustion of the underlying policies, the Court of Appeal relied on our decision in *Waller*, *supra*, 11 Cal.4th 1. There, an insured premised its bad faith claim on an insurer's refusal to provide coverage or a defense in response to an action for damages. We concluded that there was no coverage or potential for coverage under the policy, so there was no duty to defend. (*Id.* at p. 23.) Addressing the plaintiff's claim for bad faith, we explained that when the duty to defend is involved, "[i]t is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing." (*Id.* at p. 36; see *id.* at p. 37 ["If an insurance policy provides no potential basis for coverage, the insurer is under no duty to defend an action against the insured. . . . Because [the insurer] was under no obligation to defend or indemnify the . . . action, it did not breach the implied covenant of good faith and fair dealing"].)

*Waller* drew from *Love v. Fire Ins. Exchange* (1990)
221 Cal.App.3d 1136 in further explaining that "the covenant is
implied as a supplement to the express contractual covenants,
to prevent a contracting party from engaging in conduct that
frustrates the other party's rights to the benefits of the
agreement." (*Waller*, *supra*, 11 Cal.4th at p. 36, citing *Love*, at
p. 1153.)  *Waller* continued, "Thus, as the *Love* court noted,
when benefits are due an insured, 'delayed payment based on
inadequate or tardy investigations, oppressive conduct by
claims adjusters seeking to reduce the amounts legitimately
payable and numerous other tactics may breach the implied
covenant because' they frustrate the insured's right to receive
the benefits of the contract in 'prompt compensation for losses.'
[Citation.]  Absent that contractual right, however, the implied
covenant has nothing upon which to act as a supplement, and
'should not be endowed with an existence independent of its
contractual underpinnings.' " (*Waller*, at p. 36.)

*Waller*'s explanation "that a breach of the implied
covenant cannot occur 'unless policy benefits are due' refers to
whether the policy will eventually cover the claim, and . . .
not . . . when such coverage finally attaches." (*Schwartz v. State
Farm Fire & Casualty Co.* (2001) 88 Cal.App.4th 1329, 1335
(*Schwartz*).)  This is consistent with the principle that "[a]n
excess insurer's implied covenant not to injure an insured's right
to receive the benefits of the insurance contract exists from the
inception of the agreement with the insured." (*Ibid*.)  Because
the duty attaches at the inception of the insurance agreement,
wrongful conduct by the insurer from that point forward can
support a claim for bad faith.  (See *id*. at pp. 1333–1340
[allegations that an excess insurer paid rival claimants a

disproportionate share of the benefits available under its policy prior to the insureds' exhaustion of the primary policy stated a viable claim for bad faith].)

### 2. *Plaintiffs need not plead prior exhaustion of all underlying insurance to state a claim for bad faith*

We agree with plaintiffs that their inability to plead that all underlying insurance has already been exhausted is not by itself fatal to their claims for bad faith.

It is true that the absence of prior exhaustion means it cannot yet be said, at the time a complaint has been filed, that an excess insurer is in breach of any express promise within the policy to provide coverage upon the exhaustion of all underlying insurance. But an insurer may breach the implied covenant of good faith and fair dealing while remaining in technical compliance with the express terms of its policy; indeed, that is the very reason for the implied covenant's existence. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373; *Carson v. Mercury Ins. Co.* (2012) 210 Cal.App.4th 409, 429; *Schwartz*, *supra*, 88 Cal.App.4th at p. 1339.)

When it is understood that a breach of the implied covenant of good faith and fair dealing can occur before coverage is due and prior to the breach of any obligation to pay benefits under a policy, and that in some instances it may be the insurer's bad faith itself that prevents an insured from fulfilling all of the conditions of coverage (see *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574–575 [recognizing a claim for bad faith in circumstances where the insured's failure to satisfy a condition of coverage was allegedly brought about by the insurers' bad-faith conduct]), it becomes clear that it would ask

too much, too soon, from insureds to require them to plead the prior exhaustion of all underlying insurance before they may pursue a bad faith claim. The proper focus at the pleading stage is not on whether coverage under a particular excess policy has already attached and payments under that policy are already due. Rather, at that phase of the proceedings an insured in plaintiffs' position needs only to allege facts that, taken as true, are sufficient to show that coverage under a defendant insurer's excess policy *will* attach — or that it would attach, if not for the excess insurer's bad-faith conduct — and that the insurer's misconduct has impaired the insured's recovery of benefits owed to it under the policy. (See *Wilson, supra,* 42 Cal.4th at p. 723; *Waller, supra,* 11 Cal.4th at p. 36.) These allegations must be proven for a plaintiff to *recover* for tortious bad faith, which may present its own set of challenges, but that is a matter for later proceedings if the case moves forward.[12]

The Court of Appeal therefore erred by treating plaintiffs' failure to allege exhaustion as dispositive of their bad faith claims. We reverse its judgment and remand for further proceedings for that court to apply the proper standard. We decline to address St. Paul's and Liberty Mutual's arguments that plaintiffs have not alleged facts sufficient to show unreasonable conduct amounting to tortious bad faith on their

---

[12]    Plaintiffs argue that in unusual circumstances involving consequential harm to an insured a bad faith claim should be permitted even if there is no coverage under an insurance policy. They posit that *Waller* declared only a general rule and did not contemplate such scenarios. We need not decide whether such an exception exists to the coverage requirement announced in *Waller* because plaintiffs' complaint does not reveal sufficiently compelling circumstances that might justify such an inquiry.

part. Those arguments may be presented on remand. As with plaintiffs' claims seeking declaratory relief, if the Court of Appeal concludes that plaintiffs' allegations of bad faith are inadequate as to one or both defendants but that deficiency is capable of being cured through amendment, plaintiffs should be granted leave to amend. (See *Aubry, supra,* 2 Cal.4th at pp. 970–971.)

## III. DISPOSITION

We reverse the judgment of the Court of Appeal and remand the cause to that court for further proceedings consistent with this opinion.

**GUERRERO, C. J.**

**We Concur:**

**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**
**DeSANTOS, J.**[*]
**FEINBERG, J.**[**]

---

[*]     Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[**]    Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Fox Paine & Company, LLC v. Twin City Fire Insurance Company

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 104 Cal.App.5th 1034
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S287404
**Date Filed:** July 27, 2026

_____

**Court:** Superior
**County:** San Francisco
**Judge:** Andrew Y.S. Cheng

_____

**Counsel:**

Reed Smith, Raymond A. Cardozo; King & Spalding, Arwen R. Johnson, Kelly Perigoe, Matthew Noller; Pillsbury Winthrop Shaw Pittman, Anne M. Voigts, Pauleen Truong; McKool Smith and Michael J. Miguel for Plaintiffs and Appellants.

Stanzler Law Group, Jordan S. Stanzler; Cohen Tauber Spievack & Wagner and Jay B. Spievack for DNAW SPV CA Vineyard LLC as Amicus Curiae on behalf of Plaintiffs and Appellants.

Covington & Burling, David B. Goodwin, Paulina Rafizadeh and Quentin A. Fisher for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Appellants.

Maynard Nexsen, James J. Hockel, Christopher C. Frost, John C. Neiman, Jr., C. William Courtney, Brandt P. Hill and Braden T. Morell for Defendant and Respondent St. Paul Mercury Insurance Company.

Hangley Aronchick Segal Pudlin & Schiller, Ronald P. Schiller, Sharon F. McKee; Nicolaides Fink Thorpe Michaelides Sullivan and Matthew C. Lovell for Defendant and Respondent Liberty Mutual Insurance Company.

Crowell & Moring and Kendyl A. Barnholtz for the Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Defendants and Respondents.

Horvitz & Levy, Lisa Perrochet, Benjamin P. Covington and Bradley S. Pauley for the American Property Casualty Insurance Association as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Raymond A. Cardozo
Reed Smith LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

John C. Neiman, Jr.
Maynard Nexsen PC
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1228

Ronald P. Schiller
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 496-7020